**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**CHAD ANTHONY ROLLINS,**

      **Plaintiff,**

**vs.**                              **Case No.  1:17cv120-MW/CAS**

**NANCY A. BERRYHILL, Acting
Commissioner of the Social Security
Administration,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration denying Plaintiff's Title II application for period of disability and Disability Insurance Benefits.  After careful consideration of the entire record, it is respectfully recommended that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.

## I. Procedural History and Facts

On December 6, 2013, Plaintiff Chad Anthony Rollins filed a Title II application for disability insurance benefits alleging disability beginning on January 30, 2013, due to bipolar disorder.  Tr. 87,96.[1]  Plaintiff's application was denied initially on March 12, 2014, and upon reconsideration on April 22, 2014.  Tr. 96, 110.  Plaintiff requested a hearing, which was held on January 25, 2016, in Jacksonville, Florida, before Administrative Law Judge (ALJ) Gregory J. Froehlich.  Tr. 37-82.  Plaintiff, who appeared with counsel in Gainesville via teleconference, testified and Celena Earl, Vocational Expert, appeared by telephone and testified.  Psychiatrist T. Carey Merritt, M.D., also testified by telephone.  Five letters containing lay evidence were submitted.  Tr. 311-17.

The ALJ issued a decision on March 29, 2016, finding Plaintiff is not disabled and is not entitled to disability benefits.  Tr. 18-31.  The Appeals Council denied Plaintiff's request for review on March 10, 2017.  Tr. 1-6. Thus, the decision of the ALJ became the final decision of the Commissioner and is ripe for review.  Accordingly, Plaintiff, represented by

---

[1] Citations to the transcript/administrative record contained in ECF No. 10 shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.

counsel, filed a Complaint for judicial review pursuant to 42 U.S.C.

§§ 1381, *et seq.*, and 42 U.S.C. § 405(g).  *See* ECF No. 1.

### A. Hearing Testimony

Plaintiff's counsel first presented the testimony of psychiatrist

T. Carey Merritt, M.D.  Tr. 41-55.  Dr. Merritt testified that he began treating

Plaintiff in 2008 for what he described as a neuropsychiatric psychotic

condition.  Tr. 41-42.  He testified that the neuropsychiatric condition began

as a result of side effects of the drug Tamiflu, which created confusion,

delirium, and psychotic features requiring hospitalization.  Tr. 42-43.  His

initial diagnosis was schizoaffective disorder but the working diagnosis is

now bipolar disorder type one.  Tr. 52.  When Dr. Merritt saw Plaintiff

several months after the initial incident, Plaintiff was having persistent

symptoms involving some confusion, residual delusional thinking, and a

mix of depression and hypomania causing racing thoughts and

susceptibility to metaphysical or highly spiritual issues.  Tr. 43-44.  He

testified that Plaintiff has had a number of manic episodes, some brief and

some requiring hospitalization.  Tr. 45.  He said most of Plaintiff's treatment

has revolved around mood stabilizers and other medications intended to

treat his bipolar disorder, including seizure medications and antipsychotic

medications.  Tr. 47.  Plaintiff has been treated with Lithium and

risperidone, Tegretol, Depakote, and Wellbutrin.  Tr. 47-48.  Dr. Merritt

testified that between 2008 and 2011, Plaintiff's baseline was more

depressed, with periods of depression sometimes lasting months.  Tr. 49.

Dr. Merritt testified that Plaintiff has tried to work since 2008 and did

return to work several times, including as an associate pastor, but within a

month that fell apart when he began to cycle upwards.  Tr. 50-51.  Plaintiff

also worked as an assistant manager at a Chick-Fil-A but deteriorated and

could not continue.  He said Plaintiff had an episode the past December in

which he had visual hallucinations and depression.  Tr. 53.  Dr. Merritt

testified that Plaintiff tried to perform several different types of jobs but he

was unable to maintain them.  Dr. Merritt opined that Plaintiff was not

currently expected to be capable of working part time or full time, but he

hoped that with a long enough period of recovery with less pressure and

with the assistance of existing treatment and medication, Plaintiff could

eventually go back to a vocation.  Tr. 54-55.

Plaintiff Chad Anthony Rollins, age 28 at the time of the alleged onset

date, testified that he has a Bachelor's degree in business management

and is an ordained minister.  Tr. 56-57.  In the last fifteen years, he has

worked in management for a fast food restaurant, in retail clothing as a

department manager, as a utility meter reader for four years, in public

relations, and as a youth pastor from 2011 to 2013. Tr. 57-59. His last job as pastor ended in 2013 and his attempt at working at Chick Fil-A in 2013 was not successful due to his illness.

Plaintiff testified his illness began in 2008 when he had a severe neurological reaction to the medication Tamiflu, which caused him to exhibit symptoms of extreme mania, psychosis, and hallucinations. Tr. 59. He was on disability through his employer Clay Electric for about six months and then went back to work at Clay Electric until 2010 when he began to serve as a pastor at a Baptist church.[2] *Id.* He testified that while serving as a pastor, he went into a full-blown manic episode with psychosis and hallucinations. Tr. 60. He was "Baker Acted" and went to Meridian Behavioral Healthcare for treatment. *Id.*

During his manic episodes, he said he has racing thoughts, extreme irritability, extreme hyperactivity, extreme insomnia for days at a time, and cognitive disfunction due to lack of sleep, memory loss, and irrational behavior physically and with money. Tr. 60-61. Plaintiff testified that he

---

[2] Donald Osteen, Jr., who supervised Plaintiff at Clay Electric Coop, submitted a letter stating that prior to the 2008 severe reaction to Tamiflu, Plaintiff was a good worker who was also attending school to get his degree. Tr. 315. After the incident with Tamiflu, Plaintiff began exhibiting bizarre behavior. After Plaintiff was out for several months, he tried to come back but had to leave again on short term disability. *Id.* Osteen stated that because of Plaintiff's current condition, he could not be employed by Clay Electric Coop. *Id.*

has had to be hospitalized on several occasions.  Tr. 61.  His last attempt

to work at Chick-Fil-A was unsuccessful even though the employer, a

friend, gave him time to try to "basically get it together."  Tr. 62.  After he

tried to work as a youth pastor part time for a couple of weeks at a church

where his uncle was the pastor, he had a full-blown episode and had to be

hospitalized.[3]  Tr. 62-64.  He tried to work helping a friend who was

remodeling a house but that was unsuccessful because he could not

complete tasks when needed.[4]  Tr. 63.  Plaintiff testified that he has worked

for his father sporadically for a couple days a week since March or April of

2015 at a local camp that his father runs.[5]  Tr. 64.

Plaintiff testified that he sees Dr. Merritt in the office and sometimes

confers on the telephone.  Tr. 65-66.  They discuss his therapy and

medications.  He said all his medications have caused side effects

including severe weight gain, extreme thirst and dry mouth, extreme

urination, changes to sleep cycle, shortness of breath, dizziness, and

---

[3] Calvin J. Carr, Pastor of the North Central Baptist Church, submitted a letter stating that he has hired Plaintiff twice, but due to the illness, employment could not be continued.  Tr. 314.  He described Plaintiff's major episode of mania with psychosis and hospitalization that made it impossible for Plaintiff to continue as youth pastor, and Plaintiff's inability to even work setting up chairs because of hallucinations in 2015.  *Id.*

[4] The friend, Frank D. Smith, submitted a letter stating that Plaintiff's work was inconsistent and sporadic due to his illness.  Tr. 311.

[5] Plaintiff 's father, W. Perry Rollins, submitted a letter explaining that because of Plaintiff's illness, he could not be counted on to work at the camp.  Tr. 312.

sleepiness.  Tr. 66-67.  Risperdal[6] is effective to combat his psychosis but deadens him mentally and affects his cognitive functions and his mood, often causing depression.  Tr. 67.  He said depression, sometimes lasting months, always comes on after a manic episode and has required him to be hospitalized on several occasions due to suicidal thoughts and two suicide attempts.  *Id.*  Plaintiff described the suicide attempts as coming in a manic phase after his depressive phase had cycled.  Tr. 68.

During those times that he is neither manic nor depressed, he can function somewhat normally, but not as he did prior to the Tamiflu incident in 2008.  Tr. 69.  He said he is no longer dependable and consistent in what he tries to do.  *Id.*  His wife has had to go back to work due to his illness and he watches his young children some when they come home from school, but he could not do it without help from other family members.  Tr. 70.  Plaintiff's father helps mow the lawn, pressure wash the house, and maintain the cars.  His in-laws help with the children, as do his own parents and brothers.  Tr. 73.  When he has a manic episode, his wife cannot handle him and his brothers must come to take him somewhere away from

---

[6] Risperdal is a brand name for risperidone.

his wife and children, or to be hospitalized.[7]  Tr. 70-71.  He does not use

alcohol or drugs and does not smoke marijuana or cigarettes.  Tr. 72.

Celena Earl, an impartial vocational expert, testified that Plaintiff's

past work could be classified as fast food worker, light, unskilled, SVP of 2;

manager, fast food, light, skilled, SVP of 5; department manager, medium,

skilled, SVP of 7; meter reader, light, semi-skilled, SVP of 3; customer

service representative, sedentary, skilled, SVP of 5, and pastor, light

skilled, SVP of 8.  Tr. 76-77.  The ALJ presented the vocational expert with

a hypothetical describing a person of claimant's age, education and past

work, who has no exertional limitations but has mental limitations to simple

tasks with little variation taking a short period of time to learn up to and

including 30 days, is limited to work settings that do not require production

pace work, is limited socially to relating adequately with supervisors but

with no general public contact, and has only occasional coworker contact.

Tr. 77-78.  The vocational expert testified that such an individual would not

be able to perform the past work done by Plaintiff.  Tr. 78.

_____

[7] Plaintiff's wife, Amber Rollins, submitted a letter stating that for three years after the severe neuropsychiatric reaction to Tamiflu, Plaintiff continued to try to work and remained fairly stable, but in January 2013, he began to show mental symptoms similar to those he exhibited in 2008.  Tr. 316.  She stated that despite taking a less stressful job at Chick-Fil-A, and despite multiple medications, Plaintiff was unable to remain stable to work.  *Id.*  She said Plaintiff had always been a hard worker, doing what was necessary to provide for his family, prior to the reaction to Tamiflu and the resulting and continuing symptoms.  Tr. 317.

Under that same hypothetical, the vocational expert testified that the person would be able to perform work as an industrial cleaner, DOT #381.687-018, medium strength level, SVP of 2, with an estimated 1,077,500 jobs in the national economy; laundry worker, DOT #361.685-018, medium strength level, SVP of 2, with an estimated 377,400 jobs in the national economy; mail clerk, DOT #209.687-026, light, SVP of 2, with an estimated 70,900 jobs in the national economy.[8]  Tr. 78.

The vocational expert was then presented with the same hypothetical facts, but with the additional limitation that the individual would be off task for approximately 20% of the work day at infrequent intervals, outside normally permitted breaks.  Tr. 78-78.  The vocational expert testified that with these additional limitations, all work would be eliminated.  The

---

[8] DOT refers to the Dictionary of Occupational Titles (4th Ed., Rev. 1991), which is one of the examples of sources that the ALJ may rely on for job information.  *See* SSR 00-4p; 20 C.F.R. § 404.1566(d).  The ALJ may also rely on a vocational expert or other specialist.  *See* § 404.1566(e).  An SVP (Specific Vocational Preparation) of 1 means "short demonstration only."  Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month."  *Id.*  "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Id.*  Unskilled work corresponds to an SVP of 1 and 2.  SSR 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations.  SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).

vocational expert testified employers would tolerate absences of no more than one day a month.  Tr. 79.  When asked if her testimony conflicts with the Dictionary of Occupational Titles, the vocational expert testified that the DOT does not address off-task time or absences per month, but that her testimony on these issues was based on her training, education, and knowledge of how jobs are performed in the labor market.  *Id.*

At the conclusion of the hearing, Plaintiff's counsel argued that Plaintiff's mental impairment meets listing 12.04 but, at a minimum, would qualify him for disability due to medical records documenting suicidal thoughts, extreme paranoid thinking, rapid cycling with auditory hallucinations, inability to sleep, deep depression, visual hallucinations, strong side effects to Risperdal, overly abstract thinking, loose thoughts, and racing thoughts.  Tr. 80-81.

## II. Findings of the ALJ

In the decision issued March 29, 2016, the ALJ made the following pertinent findings:

> 1. **The claimant meets the insured status requirements of the Social Security Act through September 30, 2016**.  Tr. 20.
>
> 2. **The claimant has not engaged in substantial gainful activity since January 30, 2013, the alleged onset date**.  *Id.*

The ALJ noted that although Plaintiff did attempt to work from February 2013 to March 2013, these were unsuccessful work attempts.  *Id.*

3.  **The claimant has the following severe impairment: bipolar disorde**r.  *Id.*

4.  **The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1**.  Tr. 21.

The ALJ found that Plaintiff's severe impairment does not meet or medically equal the criteria of listing 12.04.  He found that at least two of the three criteria of "paragraph B" were not met in that Plaintiff had only mild restriction in the activities of daily living rather than marked restriction, citing Plaintiff's activities at home caring for children, performing household chores, working a few days a week at his father's campground, driving, handling finances, and tending to personal hygiene.  *Id.*

The ALJ further found that Plaintiff had moderate difficulties in social functioning rather than marked difficulties.  *Id.*  The ALJ found that Plaintiff had symptoms of irritability, agitation, and anxiety and felt his ability to interact with others was different than in his past.  *Id.*

With regard to concentration, persistence, or pace, the ALJ found Plaintiff had moderate difficulties rather than marked difficulties as required by "paragraph B."  *Id.*  The ALJ noted treatment records documenting confusion and decreased cognition, distractibility and word finding problems, but other treatment notes show good, but a bit slower, thought flow, and fair attention and concentration.  *Id.*

As to the required repeated episodes of decompensation under "paragraph B," the ALJ found the record reflected one to two episodes of decompensation, each of extended duration, rather than the required repeated episodes, meaning three episodes within one year.  *Id.*

The ALJ also concluded that the criteria of "paragraph C" were not met, finding that the medical evidence does not show a history of chronic affective disorder of at least two years duration that has caused more than minimal limitation in ability to perform basic work

activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change of environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  Tr. 21-22.

The ALJ noted that the limitations identified in the "paragraph B" analysis are not a residual function capacity assessment but are used to rate the severity of the impairment at steps 2 and 3 of the sequential evaluation process.  Th ALJ further noted that the residual functional capacity assessment at steps 4 and 5 requires a more detailed assessment by itemizing the functions contained in the broad categories found in "paragraph B" of the adult mental disorders listing in 12.00 of the Listing of Impairments (SSR 96-8p).  Tr. 22.

5.  **The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to performing simple tasks with little variation that take a short period of time to learn (up to and including 30 days); the claimant is limited to work settings that do not require production-paced work; the claimant is able to deal with the changes in a routine work setting; the claimant is able to relate adequately to supervisors; and the claimant can have occasional contact with coworkers, but no contact with the general public**.  Tr. 22.

In making these findings after a careful consideration of the entire record, the ALJ concluded that the medical record does not support Plaintiff's allegations of disability, noting that when Plaintiff was involuntarily admitted to Meridian Behavioral Healthcare on January 27, 2013, with manic symptoms including irritability, confusion, and paranoia, he had a Global Assessment of Functioning (GAF) score of 35.  Tr. 23.  He was placed on Depakote, but continued with confusion and suspiciousness, although no more agitated behavior.  He was diagnosed with bipolar disorder NOS and discharged on January 29, 2013.  *Id.* (citing records at Tr. 327-32).

The ALJ cited treatment notes of Dr. Merritt in February 2013 in which Plaintiff reported he was getting better, with continued improvement in his thought processes and cognition. Tr. 23 (citing records at Tr. 384). The ALJ noted that later in February 2013, Plaintiff reported to Dr. Merritt that he was better and that his delusions and thought blocking had completely resolved, with insight and judgment back to baseline. Tr. 24 (citing record at Tr. 383). The ALJ cites Dr. Merritt's notes of April 2013 which state that Plaintiff is fully recovered, with no mania, hypomania, or depression. *Id.* (referring to record at Tr. 380). In May 2013, as the ALJ comments, Dr. Merritt's notes indicate Plaintiff complained of delusions of angels and demons, racing thoughts, agitation, sleeplessness, suicidal thoughts, anxiety, and poor concentration. Tr. 24 (citing record at Tr. 378). Notes indicate that Plaintiff had to resign as assistant manager of Chick-Fil-A due to escalating symptoms of mania and intrusive delusions. *Id.* After a telephone consult with Dr. Merritt, and after Risperdal was increased, Plaintiff reported that he was starting to "come down." *Id.* In June 2013, Plaintiff reported no mania, but was "flatter" than usual, with side effects from Abilify. *Id.* (citing record at Tr. 377). Plaintiff reported doing some cabinetry with a friend. *Id.*

In August 2013, the ALJ noted, Plaintiff reported feeling stable, with no hypomania or delusional thinking, but he felt unfocused. He had good thought flow and no suicidal ideation. Tr. 24 (citing record at Tr. 376). On September 2, 2013, however, Plaintiff was admitted to Baptist Medical Center for manic symptoms. *Id.* (citing records at Tr. 334-53). The ALJ noted that Plaintiff's wife reported he had been manic for five days and held a knife to his chest. *Id.* In the hospital, where he stayed for one week, he was reported to be cooperative and appropriately dressed with good hygiene. He had normal speech and full range of affect. His thought process was logical and linear but judgment was impaired. He was diagnosed with mood disorder NOS (bipolar versus depression). *Id.* His GAF was 45. He was treated in the hospital with Depakote but continued to have episodes of agitation in which he was confrontational and disruptive. *Id.* at 25. His manic symptoms were resolved with Depakote and Risperdal, and he was discharged on September 9, 2013. *Id.*

The ALJ cited records from October 2013 and December 2013 which indicated that Plaintiff went from feeling better to having a slump, but improving to nearly baseline. Tr. 25. He was hospitalized

again on January 18, 2014, in Shands Vista Hospital after having auditory hallucinations described as demonic voices urging Plaintiff to kill himself. *Id.* (citing records at Tr. 417-49). He was treated with risperidone and Tegretol and improved, being discharged two days later. His GAF scores improved from 21 to 30 to 51 to 60, which the ALJ found indicated moderate symptoms. Tr. 25. The ALJ continued discussion of Plaintiff's ongoing mental state for March, April, May, July, August, October, and November of 2014 (Tr. 25-27); and January, March, October, December of 2015 (Tr. 27).

Plaintiff's condition was said to be in remission in April 2014. Tr. 26 (citing record at Tr. 478). In May, Plaintiff had an episode of mania and visual hallucination. *Id.* (referring to record at Tr. 477). In July 2014, Plaintiff exhibited anxiety after an increase in Latuda, but improved on a change of dosage. *Id.* Also in July, as the ALJ noted, Dr. Merritt opined that Plaintiff would have difficulty working on a sustained basis and would miss more than four days of work a month. *Id.* (citing record at Tr. 455-71). In August 2014, Plaintiff reported an episode and suicidal ideation, with actual planning, after fixating on spiritual and metaphysical issues. *Id.* (citing record at Tr. 474). By October 2014, Plaintiff had stopped taking Latuda and was agitated, having auditory hallucinations for two days after extensive praying and Bible reading. This was relieved by starting Risperdal, but he was depressed. He did care for his children when they came home from school but felt overwhelmed. Tr. 26 (citing record at Tr. 481). Plaintiff reported doing better in November 2014, after stopping Latuda and starting Lithium. Tr. 27 (citing record at Tr. 497).

In January 2015, the ALJ noted, Plaintiff was reported to be "doing pretty well," without manic or hypomania episodes. *Id.* (citing record at Tr. 496). He reported he was currently stable and acting as "Mr. Mom" caring for the children during the day and helping with the housework, but was frustrated that he was not able to work. His affect was subdued, mood a bit depressed, thinking a bit slow, but no hallucinations. *Id.* In March 2015, Plaintiff reported two brief episodes of visual hallucinations, but in April 2015, he reported his symptoms resolved with Risperdal. Plaintiff was helping his father at the campground a couple days a week. Tr. 27 (citing records at Tr. 495,494). The ALJ noted that in October 2015, Plaintiff reported some mild mania, racing thoughts, and depression. *Id.* (citing record at Tr. 493). In December 2015, Plaintiff reported auditory and visual

hallucinations, and Risperdal was restarted and he improved within several days.  He was teaching Sunday School part time and his affect, mood, and thought processes were all normal.  Plaintiff remained on Lithium and Tegretol.  *Id.* (citing record at Tr. 492).

The ALJ concluded, after reviewing the record, that the evidence does not establish Plaintiff's impairments are disabling in nature or prevent him from performing work in accord with the RFC found by the ALJ.  Tr. 28.  The ALJ also gave little weight to Dr. Merritt's opinions, including his testimony, the mental status report (at Tr. 450-53), and the psychiatric evaluation/functional capacity opinion (at Tr. 455-71), because the ALJ concluded they are not consistent with his treatment records that show good response to treatment with Risperdal and because of Plaintiff's daily activities.  Tr. 28.

6.  **The claimant is unable to perform any past relevant work.  Tr. 29**.

Plaintiff's past relevant work was described as a meter reader, customer service representative, or pastor.  Tr. 29.

7.  **The claimant was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date**.  *Id.*

8.  **The claimant has at least a high school education and is able to communicate in English**.  *Id.*

9.  **Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills**.  *Id.*

10.  **Considering claimants' age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform**.  Tr. 30*.*

Based on the RFC found by the ALJ and the testimony of the vocational expert at the hearing, the ALJ found that Plaintiff could perform the representative jobs of industrial cleaner, DOT #381.687-

018, medium strength level, unskilled SVP of 2, with an estimated 1,077,500 jobs in the national economy; laundry worker, DOT #361.685-018, medium strength level, unskilled SVP of 2, with an estimated 377,400 jobs in the national economy; and mail clerk, DOT #209.687-026, light, unskilled SVP of 2, with an estimated 70,900 jobs in the national economy.  Tr. 30.

     11.  **The claimant has not been under a disability, as defined in the Social Security Act, from January 30, 2013, through the date of the decision [March 29, 2016]**.  *Id.*

Pursuant to these findings, the ALJ found that Plaintiff is not disabled under sections 216(i) and 223(d) of the Social Security Act and is therefore not entitled to disability benefits.  Tr. 28.

### III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002)

(citations omitted).[9]  The Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner, Bloodsworth, 703 F.2d at 1239, although the Court must scrutinize the entire record, consider evidence detracting from the evidence on which the Commissioner relied, and determine the reasonableness of the factual findings.  Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986).  Review is deferential, but the reviewing court conducts what has been referred to as "an independent review of the record."  Flynn v. Heckler, 768 F.2d 1273, 1273 (11th Cir. 1985).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

---

[9] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  An individual is entitled to disability insurance benefits if he is under a disability prior to the expiration of his insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

Pursuant to 20 C.F.R. § 404.1520(a)(4)(i)-(v), the Commissioner analyzes a claim in five steps:

1.  Is the individual currently engaged in substantial gainful activity?

2.  Does the individual have any severe impairments?

3.  Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.  Does the individual have the residual functional capacity (RFC) to perform work despite limitations and are there any impairments which prevent past relevant work?[10]

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work available

---

[10] Residual functional capacity is the most a claimant can still do despite limitations. 20 C.F.R. § 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of his or her limitations, observations by treating and examining physicians or other persons, and medical records. *Id.* The responsibility for determining claimant's RFC lies with the ALJ. 20 C.F.R. § 404.1546(c); *see* Social Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) (rescinded eff. Mar. 27, 2017) ("The term "*residual functional capacity assessment*" describes an adjudicator's finding about the ability of an individual to perform work-related activities.  The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

in significant numbers in the national economy in light of the claimant's

RFC, age, education, and work experience.  *See* Phillips v. Barnhart, 357

F.3d 1232, 1237 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1228-29

(11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d

1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).  If the

Commissioner carries this burden, the claimant must prove that he or she

cannot perform the work suggested by the Commissioner.  Hale v. Bowen,

831 F.2d 1007, 1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that he is disabled, and

consequently, is responsible for producing evidence in support of his claim.

*See* 20 C.F.R. § 404.1512(a); Moore, 405 F.3d at 1211.  The responsibility

of weighing the medical evidence and resolving any conflicts in the record

rests with the ALJ.  *See* Battle v. Astrue, 243 F. App'x 514, 523 (11th Cir.

2007) (unpublished).

The opinion of the claimant's treating physician must be accorded

considerable weight by the Commissioner unless good cause is shown to

the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

This is so because treating physicians "are likely to be the medical

professionals most able to provide a detailed, longitudinal picture of [the

claimant's] medical impairment(s) and may bring a unique perspective to

the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).[11] "This requires a relationship of both duration and frequency." Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor, 786 F.2d at 1053.

The ALJ may discount the treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supported a contrary finding," the opinion is "conclusory or inconsistent with [the treating physician's] own medical

---

[11] This provision applies to claims filed before March 27, 2017. See 20 C.F.R. § 404.1527, "Evaluating opinion evidence for claims filed before March 27, 2017." For claims filed after that date, the applicable provision is section 404.1520c, "How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017."

records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence or is wholly conclusory."  Lewis, 125 F.3d at 1440; Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

Some opinions, on issues such as whether the claimant is unable to work, the claimant's RFC, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of the case; *i.e.*, that would direct the determination or decision of disability."  20 C.F.R. § 404.1527(d); *see* Bell v. Bowen, 796 F.2d 1350, 1353-54 (11th Cir. 1986).  "[T]reating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance."  SSR 96-5p, 1996 SSR LEXIS 2, at *6 (1996) (rescinded eff. Mar. 27, 2017).

Although physicians' opinions about what a claimant can still do or the claimant's restrictions are relevant evidence, such opinions are not determinative because the ALJ has responsibility of assessing the claimant's RFC.  A treating physician's opinion that a claimant is unable to work and is necessarily disabled would not be entitled to any special weight or deference.  The regulations expressly exclude such a disability opinion from the definition of a medical opinion because it is an issue reserved to the Commissioner and a medical source is not given "any special significance" with respect to issues reserved to the Commissioner, such as disability.  20 C.F.R. § 404.1527(d)(1), (3); SSR 96-5p, 1996 SSR LEXIS 2, at *6 (rescinded eff. Mar. 27, 2017).  In <u>Lewis</u>, the court noted "that we are concerned here with the doctors' evaluations of [the claimant's] condition and the medical consequences thereof, not their opinion of the legal consequences of his condition.  Our focus is on the objective medical findings made by each doctor and their analysis based on those medical findings."  125 F.3d at 1440.

Generally, more weight is given to the opinion of a specialist "about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  20 C.F.R. § 404.1527(c)(2), (5)[12]; *see*

---

[12] *See* note 11, *supra*.

*also* <u>Benecke v. Barnhart</u>, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (noting

that "[s]pecialized knowledge may be particularly important with respect to

a disease . . . that is poorly understood within much of the medical

community") (<u>Benecke</u> quoted in <u>Somogy v. Comm'r of Soc. Sec.</u>, 366 F.

App'x 56, 65 n.13 (11th Cir. 2010) (unpublished)).   Although a claimant may

provide a statement containing a treating physician's opinion of his

remaining capabilities, the ALJ must evaluate such a statement in light of

the other evidence presented and the ALJ must make the ultimate

determination of disability.   20 C.F.R. §§ 404.1512, 404.1513, 404.1527,

404.1545.

### IV. Analysis

Plaintiff contends that substantial evidence does not support a finding

that he is capable of performing fulltime work.   He also contends that the

ALJ erred in failing to accord substantial weight to the opinion of treating

physician Dr. Merritt that Plaintiff's bipolar disorder and associated

symptoms impose limitations that render him incapable of either full time or

part time work.   ECF No. 21-1 at 18.   Plaintiff argues that the ALJ's treating

physician analysis failed to mention the treating physician's availability

during the hearing to explain, if such was necessary, any perceived

disparity between Dr. Merritt's opinion that Plaintiff is unable to work full

time and the treatment notes.  *Id.* at 25.  At the hearing, Dr. Merritt testified

by telephone to his treatment of Plaintiff, and the details of Plaintiff's mental

condition and symptoms, beginning in 2008 through 2015, in which Dr.

Merritt opined that Plaintiff was unable to do any kind of full time or part

time work.  Tr. 54.  Dr. Merritt was questioned at the hearing by Plaintiff's

counsel and no questions were asked of him by the ALJ.  At the conclusion

of his testimony, Dr. Merritt inquired if he should remain on the telephone

line in case any other questions were to come up and the ALJ responded in

the negative.  Tr. 55.

At the time of the filing of the application in this case, the law provided

that the opinion of the claimant's treating physician must be accorded

significant or considerable weight by the Commissioner unless good cause

is shown to the contrary.  Lewis, 125 F.3d at 1440; Lamb v Bowen, 847

F.2d 698, 703 (11th Cir. 1988).  Good cause to discount a treating

physician's opinion may be found when the opinion is "not bolstered by the

evidence," the evidence "supported a contrary finding," the opinion is

"inconsistent with [the treating physician's] own medical records," the

statement "contains no [supporting] clinical data or information," the opinion

"is unsubstantiated by any clinical or laboratory findings," or the opinion "is

not accompanied by objective medical evidence or is wholly conclusory."

*Id.* Substantial evidence must support the reasons for giving little weight to the opinion of the treating physician. Marbury, 957 F.2d at 841.

In this case, the ALJ gave little weight to Dr. Merritt's opinions on the grounds that they were "not consistent with his treatment records that show a good response to treatment with Risperdal" and because of Plaintiff's daily activities. Tr. 28. The ALJ also discounted Dr. Merritt's opinions on the ground that Plaintiff's "work attempts have generally required greater mental abilities than in the residual functional capacity limitations." *Id.* The ALJ gave partial weight to the opinions of the non-examining agency psychological consultant's opinion that Plaintiff was stabilized on his current medications and the non-examining reconsideration level psychological consultant, who opined that Plaintiff could perform routine tasks on a sustained basis with normal supervision and could cooperate with co-workers. Tr. 28. (citing records at Tr. 97-95; 98-109).[13] The record does not indicate that Plaintiff was referred for an examination by a consultative physician.

Plaintiff argues that the substantial evidence in the case demonstrates that Dr. Merritt treated Plaintiff for almost eight years, and

---

[13] The agency psychological consultants issued their opinions in March and April of 2014 without benefit of Dr. Merritt's July 2014 Psychiatric Evaluation/Functional Capacity analysis and without benefit of his opinions and testimony at the hearing, which covered Plaintiff's continued treatment through the remainder of 2014 and 2015.

this longitudinal nature of psychiatric care establishes the chronicity of Plaintiff's mental illness.  ECF No. 21-1 at 33.  He also contends that the letters from family, employers, and friends support Dr. Merritt's opinions that Plaintiff is unable, due to his mental impairment, to work full time.

The Commissioner argues Dr. Merritt's opinion that Plaintiff could not do any kind of work, part time or full time, is belied by evidence that Plaintiff was able to work several days a week at his father's campground and because he could provide after school care for children.  ECF No. 23 at 5. The Commissioner contends without elaboration that these facts provide substantial evidence supporting the ALJ's conclusion that the record did not bolster Dr. Merritt's opinion.[14]  *Id.* at 6.  It is true that 20 C.F.R. § 404.1571 provides that a claimant's ability to work on a part time basis may constitute probative evidence of his or her ability to perform duties of a full-time job, but a review of the entire record, and the details of the work Plaintiff was able to perform does not suggest that Plaintiff's part time work and daily activities would translate successfully into full time work.  The record shows that he was working for his father several days a week "when he has been able to work, but because of his illness it is hard to count on him."  Tr. 312.

---

[14] The Commissioner's conclusory response does not provide the Court with much assistance.

Other letters submitted into evidence also indicate that Plaintiff's ability to work consistently was substantially impaired by his condition and that his work was sporadic.  His supervisor at Clay Electric Coop noted that Plaintiff's illness was too unpredictable. Tr. 315.  Frank Smith's letter indicates that Plaintiff's part time work helping to remodel a home was not consistent or dependable due to his illness.  Tr. 311.  Pastor Carr noted that Plaintiff's illness prevented him from performing dependable services for the church even with a very flexible schedule. Tr. 314.

Moreover, although the ALJ properly considers a claimant's daily activities when evaluating alleged disabling symptoms, *see* 20 C.F.R. § 404.1529(c)(3)(i); Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987), "participation in everyday activities of short duration, such as housework" does not disqualify a claimant from disability and is not necessarily inconsistent with the limitations recommended by the claimant's treating physicians. Lewis, 125 F.3d at 1441.  Moreover, the evidence established that in caring for his children after school, Plaintiff needed help from his family members, especially when his bipolar disease was cycling.

The Commissioner and the ALJ overlook the wealth of other evidence that detracts from that on which the Commissioner relied in finding Plaintiff could perform full time work.  In determining if substantial evidence

supports the decision of the ALJ, this Court is required to look at evidence that substantially detracts from the evidence on which the Commissioner relied, and determine the reasonableness of the factual findings. Lowery, 979 F.2d at 837; Parker, 793 F.2d at 1180; Tieniber, 720 F.2d at 1253. This Court's review must be deferential, but the Court must also conduct "an independent review of the record." *See* Flynn, 768 F.2d at 1273. "A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber, 720 F.2d at 1253. "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

Substantial evidence does not support the ALJ's proffered reasons for discounting the treating physician's opinions. *See* Marbury, 957 F.2d at 841. The ALJ is correct that the treatment records indicate that some of Plaintiff's symptoms improved upon treatment with Risperdal. Even so, the body of Dr. Merritt's longitudinal treatment records covering 2013 through

2015, and his testimony at the hearing, support Dr. Merritt's opinions.

Dr. Merritt prepared a Psychiatric Evaluation/Functional Capacity form in

July 2014 in which he noted Plaintiff's diagnosis as Affective Disorders—

Bipolar syndrome with a history of episodic manic and depressive

syndromes.  Tr. 455, 458.  He found that Plaintiff's depressive syndrome

was characterized by pervasive loss of interest in activities; sleep

disturbance; agitation; decreased energy; feelings of worthlessness;

difficulty concentrating or thinking; thoughts of suicide; and hallucinations,

delusions, or paranoid thinking.  Tr. 458.  He also found that Plaintiff's

manic syndrome was characterized by hyperactivity; flight of ideas;

decreased need for sleep; distractibility; involvement in activities with high

probability of painful unrecognized consequences; and hallucinations,

delusions, or paranoid thinking.  *Id.*

In the impairment evaluation, Dr. Merritt noted that Plaintiff's

symptoms are intermittent—cycling about every six to eight weeks.

Tr. 462-63.  Plaintiff's hallucinations or delusions occur during both his

depressive and his manic episodes.  Tr. 462.  He indicated that Plaintiff's

feelings of worthlessness were persistent, and he had oddities of thought

characterized as hyper-religiosity.  *Id.*  Dr. Merritt noted that Plaintiff's

disorganized behavior occurred during his manic phase as did his illogical

thinking. *Id.* Plaintiff's suicidal ideation was noted as was his severe mood disturbance. *Id.* Dr. Merritt opined that Plaintiff's prognosis was guarded but fair with treatment. Tr. 463.

As for Plaintiff's ability to do work-related activities, Dr. Merritt opined that Plaintiff's ability to maintain regular attendance and be punctual was poor or none. Tr. 466. His ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms was also poor or none. Tr. 467. His ability to perform at a consistent pace without an unreasonable number and length of rest periods was fair, but only when he was not depressed. *Id.* Dr. Merritt explained these opinions with the additional information that during Plaintiff's mood swings, when manic, he becomes suspicious of others and when depressive he has low energy and poor cognition. *Id.* Dr. Merritt also opined that Plaintiff had poor or no ability to set realistic goals and make plans, and when manic, his thinking is rushed and he loses structure. Tr. 467-68. Dr. Merritt also opined that Plaintiff's ability to maintain socially appropriate behavior was poor or none. Tr. 468. On average, Dr. Merritt opined that Plaintiff would be absent from work due to his impairments more than three times a month, and would have difficulty working at a regular job. Tr. 468-69.

After executing this evaluation, Dr. Merritt continued to treat Plaintiff through 2014 and throughout 2015.  The August 11, 2014, medical records show that Plaintiff had been experiencing bipolar symptoms from August 4 until August 10, and had been cycling with a mixture of depressive mood interspersed with hypomanic thinking, which was "worrisome for long term prognosis especially since he is on six affective and behavioral modulating agents, including the PRN Risperidone."  Tr. 488.  Dr. Merritt noted Plaintiff had revealed suicidal thinking to his family.  *Id.*  On August 26, 2014, Plaintiff reported side effects to prescribed Latuda, which increased his anxiety and caused him difficulty in being still.  Tr. 487.  In September 2014, Plaintiff was given a lithium refill.  Tr. 482.  In October 2014, Plaintiff reported deep depression and hallucinations after praying and reading the Bible.  Tr. 481.  He had a passive death wish and some paranoia.  He was still taking Risperdal to alleviate psychotic symptoms.  *Id.*  Plaintiff was somewhat better in November 2014 and was continuing medications, but Risperdal was not noted at that time.  Tr. 497.

Dr. Merritt's office notes for 2015 indicate that in January 2015, Plaintiff was doing well but his thinking was still not right.  Plaintiff was still affected adversely if he read religious materials.  Tr. 496.  In March 2015, Plaintiff was experiencing racing thoughts, depression, and some

hallucinations. He restarted risperidone, which resolved his psychotic

symptoms late in March. Tr. 495, 494. In April 2015, Plaintiff had some

residual depression, flattening of his affect, mood and reactivity. Tr. 494.

In October 2015, Plaintiff was continuing to have some affective instability,

mild mania, racing thoughts, and overly abstract thinking, with episodes of

crashing into depression. Tr. 493. He was not taking risperidone at the

time. *Id.* In December 2015, Plaintiff had another episode of

hallucinations, both visual and auditory, and was directed to restart

Risperdal to avoid full mania. Tr. 492.

These longitudinal records demonstrate, as Dr. Merritt's RFC

evaluation indicated, that Plaintiff's bipolar symptoms tend to cycle and that

although Risperdal helps alleviate the psychotic aspects of his episodes,

the medication does not resolve the other aspects of Plaintiff's bipolar

symptoms. The ALJ's explanation for giving little weight to Dr. Merritt's

opinions—that he shows a good response to treatment with Risperdal—is

not borne out by the medical records which document other manic and

depressive symptoms that are not consistently alleviated with medication.

Further, Dr. Merritt's office notes do not indicate that risperidone or

Risperdal was consistently prescribed as a daily medication. Plaintiff was

prescribed Risperdal or risperidone to treat manic or psychotic features as

a "rescue med," *see* Tr. 494, and was not directed to stay on them

constantly.  (*See* notes at Tr. 487 directing Plaintiff to use risperidone as

necessary for "breakthrough mania"; notes at Tr. 493 directing Plaintiff to

use Risperdal for "breakthrough manic symptoms"; notes at Tr. 481

directing Plaintiff to use Risperdal as necessary if psychotic symptoms

appear; notes at Tr. 495 directing Plaintiff to "cont. Risperidone for now at 1

mg BID, but drop AM does if sedation or 'slow down' pattern develops").

There is no indication in the medical record that Plaintiff was non-compliant

in taking his medications as directed.  Office notes from June 2014 state,

"He's been compliant with his medications."  Tr. 476.  Office notes from

January 2015 state, "He is compliant with the medications and is currently

tolerating them".  Tr. 496.

A complete review of the record does not support the ALJ's

justification that the treating physician's opinions are "not bolstered by the

evidence," or that the evidence "supported a contrary finding," or that the

opinion is "conclusory or inconsistent with [the treating physician's] own

medical records."  *See* <u>Lewis</u>, 125 F.3d at 1440.  Because the ALJ was not

justified in giving only little weight to the opinions of the long-term treating

physician, and because the entire record, including medical records,

testimony at the hearing, and the letters of lay witnesses support

Dr. Merritt's opinions, the decision to find Plaintiff is not disabled is not supported by substantial evidence and should be reversed.

## V. Conclusion

After a review of the entire record, it is respectfully recommended that, pursuant to 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff Rollins' application for Social Security benefits should be **REVERSED and REMANDED** to the Administrative Law Judge for further proceedings consistent with this report and recommendation and to consider referring Plaintiff for a consultative examination. It is further recommended that the Clerk be directed to close the file.

**IN CHAMBERS** at Tallahassee, Florida, on February 26, 2018.

**S/ Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the magistrate judge's findings or**

**recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**